[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
In this pending marital dissolution action, the defendant has filed a motion for alimony pendente lite.
Connecticut General Statute 46b-83, which authorizes the court to order temporary alimony, directs the court, in making an order for alimony pendente lite, to consider the factors enumerated in C.G.S. 46b-82 concerning an award of permanent alimony at the time of judgment, except the grounds for the complaint or cross complaint. In making its determination in this matter, the court has considered the statutory criteria and relevant decisional law. Based on the evidence adduced at the hearing, the court makes the CT Page 11992 following findings and order.
The parties were married on August 25, 1980. The defendant, who is forty years old, is a Ph.D. candidate at the University of Connecticut, studying Human Genetics. She has completed her course work and is developing the research component of her program. At present she has no teaching duties, and no earnings. While Ms. Guiliano-Greene generally enjoys good health, she has experienced health-related consequences from the marital breakdown. She has lost weight, and has difficulty sleeping and maintaining focus on her studies. She is treating with a therapist, and she is taking anti-depressants.
At present, Ms. Guiliano-Greene resides in the former family residence in Avon. This is a condominium with a value in the range of two hundred thirty to two hundred fifty ($230,000-250,000) thousand dollars, with a mortgage of approximately one hundred sixty three thousand ($163,000) dollars. Principal, interest, and taxes on this mortgage amount to three hundred seventy five ($375) dollars a week. In addition there is a condo fee of approximately thirty six ($36) dollars a week. Ms. Guiliano-Greene operates a 1993 Acura Legend, for which there is a loan payment of approximately one hundred forty ($140) dollars a week, insurance at a cost of approximately twenty eight ($28) dollars a week, and auto taxes averaging approximately eight ($8) dollars weekly.
The plaintiff, age thirty nine, is an attorney, engaged in the practice of law as a sole practitioner in Avon, Connecticut. He testified to no health-related impairments. The parties separated in January, 1997. Since February, the plaintiff has been residing with Lisa Brunelle and her children at 7 Fernwood Road in Avon. This is a residence Ms. Brunelle and her former husband occupied under a lease with an option to purchase. In June, 1997, title to the property was vested in Ms. Brunelle.
Understanding the plaintiff's true earnings, and accurately identifying his assets and liabilities is not a task made easy by the contents of the financial affidavits he has presented in conjunction with this hearing. For example, though the Fernwood residence is titled in Ms. Brunelle's name only, the defendant presented a real estate CT Page 11993 purchase agreement for this property signed by both Atty Greene and Ms. Brunelle as the buyers. This document, which listed the purchase price as ninety three thousand ($93,000) dollars, indicated that the buyer had made a deposit of five thousand ($5000) dollars, and would make a further deposit of four thousand, five hundred sixty-seven ($4567) dollars by May 1st. The closing statement, naming only Ms. Brunelle as the purchaser, indicates that the property sold for ninety-three thousand ($93,000) dollars, and that Ms. Brunelle obtained a mortgage of seventy-four thousand, two hundred fifty ($74,250) dollars. The difference between the amount of the mortgage and the sales price was the initial deposit of five thousand ($5000) dollars, a credit of four thousand, six hundred fifty-nine dollars ($4659), and additional cash in the amount of thirteen thousand, four hundred thirty-nine ($13,439) dollars paid at the closing. From the testimony of Ms. Brunelle, the court concludes that she and her former husband were renting the property with an option to buy. At the time of the Brunelle marital dissolution in February, 1997, Ms. Brunelle obtained the right to exercise this option. The sum of four thousand, six hundred fifty-nine ($4659) dollars credited to Ms. Brunelle represented that portion of the Brunelle rental payments that was allocated toward the purchase price. Additionally, it is evident from the settlement statement that there were closing costs of approximately four thousand, three hundred forty-nine ($4349) dollars. Thus, in order to close on this property, Ms. Brunelle was required to pay cash of approximately seventeen thousand, four hundred forty ($17,440) dollars. After the home was purchased, Ms. Brunelle and Atty Greene contracted for extensive renovations and improvements. On June 19, 1997. Atty Greene and Ms. Brunelle signed an acceptance of a proposal by RW Construction for work in the living room, hallway, kitchen, and bathroom, for a total cost of ten thousand, one hundred eight ($10,108) dollars. Later, on June 30, 1997, Atty Greene and Ms. Brunelle signed an acceptance of another proposal by RW Construction Company. This agreement was for work in the master bedroom, and required payment of ten thousand, seven hundred seventy-three ($10,773) dollars. There were also bills totaling approximately twenty-five hundred ($2500) dollars from Home Depot, Inc, and the Canal Tree Service for work performed at the Fernwood residence during the summer. CT Page 11994
Ms. Brunelle, who is self-employed in a cleaning business, presented a financial affidavit, dated February 7, 1997, in conjunction with her marital dissolution in which she indicated that the total value of her assets was eleven thousand, three hundred fifty ($11,350) dollars. This included a car, jewelry, furniture, and appliances totaling ninety-five hundred ($9500) dollars. Her liquidity consisted of a bank account with a balance of fifteen hundred ($1500) dollars, and accounts in her childrens' names with a total value of three hundred fifty ($350) dollars. Her affidavit indicated that she earned a weekly net of four hundred eight ($408) dollars. As part of the marital dissolution agreement, Ms. Brunelle was awarded no alimony. No property, other than her automobile, was assigned to her. Even though Ms. Brunelle testified that her earnings have risen since her marital dissolution, this is not the financial picture of one who, within four months of her marital dissolution, is able to purchase a home paying seventeen thousand ($17,000) dollars at the closing, and shortly thereafter paying several thousand dollars more for renovations.
Ms. Brunelle testified that Atty Greene's father, Sidney Greene, loaned her either twenty or twenty-five thousand ($20,000 — $25,000) dollars for the purchase of the home by issuance of a check in this amount to Atty Greene. While the court credits Ms. Brunelle's testimony that the funds in conjunction with the home purchase came from Atty Greene, there is no credible evidence that Sidney Greene loaned any funds to Ms. Brunelle. Ms. Brunelle also testified that she believed the funds to pay RW Construction came from Sidney Greene. There is no credible evidence to support this assertion.
With respect to the funds utilized for the Fernwood residence, it is clear to the court that the funds did not come from Ms. Brunelle, and that they did come from Atty Greene. Whether or not they originated with Sidney Greene is not crucial to the court's determination. It is the court's intention to include the periodic receipt of funds from Sidney Greene by the plaintiff as part of funds historically made available to him for his personal use.
It is noteworthy that the plaintiff's financial statement includes no mention of the Fernwood residence as a CT Page 11995 property in which he has any legal interest or liability. He denied any interest in this property during his testimony. On this basis, it would appear that funds advanced by Atty Greene to Ms. Brunelle for the purchase and remodeling of the home were gifts to her from Atty Greene.
Ms. Brunelle currently operates a 1998 Volvo station wagon, with a stated fair market value of thirty-eight thousand ($38,000) dollars. The lease for this vehicle is dated September 29, 1997, and was signed by the plaintiff as authorized agent for a company known as "At Your Service LLC". This is the name ascribed to Ms. Brunelle's cleaning service. It is of concern to the court that even though Atty Greene also signed this lease as a guarantor, the liability to make total lease payments of fifteen thousand, five hundred thirty-five ($15,535) dollars at four hundred thirty-one ($431) dollars a month is not shown on his financial affidavit. The court notes that Atty Greene signed the Volvo credit application on September 27, 1997 as a co-applicant. Information concerning only his salary, and not Ms. Brunelle's, was provided in conjunction with this application. It is noteworthy that Atty Greene undertook to guarantee this lease obligation subsequent to August 11, 1997, the date of the defendant's motion for alimonypendente lite. This obligation should have been recorded on the plaintiff's financial affidavit.
The financial affidavits Atty Greene has filed in conjunction with this hearing do not portray a complete or accurate picture of his disposable earnings. On September 24, 1997, Atty Greene executed an affidavit claiming that his weekly gross wages were seven hundred eleven ($711) dollars. Subsequently, by affidavit dated November 4, 1997, Atty Greene claimed that his weekly gross earnings were eight hundred eighteen ($818) dollars. As footnotes to both documents, Atty Greene asserted that his weekly income figures represented actual year-to-date gross income and taxes withheld. It would have been more accurate for Atty Greene to have stated that these sums were the amounts he claims as wages in his internal law firm book keeping. Assuming, arguendo, that all of Atty Greene's receipts are noted in the corporate ledger, the problem lies in his treatment of certain expenses as business costs. For example, from a review of the corporate expense ledger, it is apparent that Atty Greene claims loan repayments to CT Page 11996 Sidney Greene as business expenses in spite of his acknowledgment that some of these funds were used for personal purposes. No such liability is reflected in the corporate balance sheet on either corporate tax return adduced at evidence at trial.
Additionally, Atty Greene admitted in testimony that certain claimed office expenses are, in fact, personal. Golf outings and health food costs were among those noted.
In this matter, the court believes that the plaintiff's financial affidavits do not provide an adequate basis for the court's reliance. Therefore, the court has determined to utilize historical information regarding the plaintiff's receipt of funds and his expenditures as a basis for its orders.
For calendar year 1994, Atty Greene reported gross earnings of sixty three thousand ($63,000) dollars. After payment of state and Federal taxes, his net reported earnings from employment were fifty one thousand, seven hundred sixty-six ($51,766) dollars. In addition, the corporate Federal tax return for FY 1994 indicates that Atty Greene's corporation loaned him the sum of five thousand, nine hundred fifty-seven ($5957) dollars. In 1995, Atty Greene reported gross wages of forty eight thousand, nine hundred ($48,900) dollars. After taxes, he reported net earnings of thirty eight thousand, three hundred ninety-eight ($38,398) dollars. In addition, in FY 1995, the corporation loaned Atty Greene the sum of five thousand, eight hundred thirty-four ($5834) dollars. Atty Greene's 1996 Federal tax return indicates that his earnings, net of taxes, totaled thirty-two thousand, three hundred nine ($32,309) dollars. Evidence regarding any further loans to Atty Greene from his practice in 1996 was not adduced at trial. These figures for 1994, 1995, and 1996 do not include distributions to Atty Greene from the sale of assets, or funds from his father.
From January 1, 1997 through September 22, 1997, Atty Greene claims that he has received net wages of twenty-two thousand, four hundred nineteen ($22,419) dollars. On an annualized basis, the amount equates to slightly less than thirty thousand ($30,000) dollars. The plaintiff testified that the wages paid to him thus far this year have been CT Page 11997 based on a gross annualized salary of fifty-two thousand ($52,000) dollars. This figure has no predictive value. As noted, the amount allocated by Atty Greene's corporation as wages flows from a corporate determination to deduct various personal expenses as business costs. Additionally, the court notes that when Atty Greene completed a financial statement on November 26, 1996 for the purpose of obtaining a bank loan, he reported his annual income to be fifty-two thousand ($52,000) dollars and his commissions and bonuses to be "whatever I want." Defendant's Exhibit H, Farmington Savings Bank loan application.
During the period 1994 through 1996, Atty Greene sold securities, receiving the aggregate net sum of twenty-five thousand, eight hundred thirty-eight ($25,838) dollars.
During 1997, the plaintiff has depleted assets by the liquidation of various Janus Funds in his name and the realization of approximately thirty-six thousand, six hundred sixty-five ($36,665) dollars. Those funds have been expended.[1]
Finally, with respect to funds made available to the plaintiff over the past few years, Atty Greene has received substantial funds from his father. As noted, he received twenty five thousand ($25,000) dollars in 1997. Atty Greene testified that his father provided thirty thousand ($30,000) dollars to him in 1988 for the purchase of property in Simsbury. He claimed that his father made a loan of forty thousand ($40,000) dollars to his practice in 1993, and he stated that the practice repays this total amount, seventy thousand ($70,000) dollars, at the rate of four hundred fifty ($450) dollars a month. While the plaintiff produced no documentation in support of his claim that his father loaned any funds to the corporation at any time, he did produce a promissory note dated October 24, 1988 from himself in favor of his father in the amount of thirty thousand ($30,000) dollars. The court gleans from this note that funds were provided to the plaintiff in 1988, and the corporation has been repaying this note on the plaintiff's behalf. In 1997, in addition to the sum of twenty five thousand ($25,000) advanced by Sidney Greene to the plaintiff in conjunction with Ms. Brunelle's house, it appears, from Atty Greene's testimony, that his father provided him an additional fifteen thousand ($15,000) CT Page 11998 dollars. Thus, while the exact amount of funds advanced to the plaintiff from his father over the past several years is unclear, it appears that the total amount approximates one hundred thousand ($100,000) dollars. Payments have been recurrent.[2]
In attempting to ascertain the plaintiff's disposable income over the past several years, the court has factored out the distributions to the plaintiff resulting from the liquidation of assets on the basis that these distributions are not going to recur. However, the court does include the periodic distributions from Sidney Greene because they have been recurrent. This analysis, however, is not sufficient since Atty Greene's reporting of income is suspect. Based on present corporate practices, particularly in regard to the payment of personal expenses and payments made to Sidney Greene by the corporation, the court is not satisfied that Atty Greene's report of past earnings is entitled to credit. It is not a reliable basis for the court's determination of an appropriate alimony order.
Since the plaintiff has not provided the court a clear and candid view of his earnings from his financial affidavit, from his testimony, or from documentary evidence, the court turns to an analysis of the plaintiff's spending experience as an indicator of the amount of money historically available to him.
In that regard, the defendant presented a cash flow analysis, based on her review of cancelled checks and her recollection of cash payments to her from the plaintiff. This chart demonstrates that in 1994 the total dollar amount of checks written by the plaintiff for personal and family expenses was sixty-four thousand ($64,000) dollars. In 1995, the total amount was sixty-nine thousand, seven hundred eighty ($69,780) dollars, and in 1996, the total amount was seventy-eight thousand, six hundred sixty-two ($78,662) dollars. For 1997, checks written through September totaled approximately seventy-four thousand, seven hundred ($74,700) dollars. Assuming this encompasses forty weeks of 1997, this amount equates to average weekly spending of one thousand four hundred sixty-five ($1465) dollars. The court believes, however, that it would be inappropriate to include, for this purpose, checks written on funds received from principal distributions because these events are not likely to recur. CT Page 11999
From 1994 until September, 1997, the plaintiff received principal distributions totaling sixty-two thousand, five hundred three ($62,503) dollars from the sale of liquidities. Since the purpose of this exercise is to determine the plaintiff's disposable income by analyzing his spending, the court has subtracted this amount from the tally reported by the defendant of all checks written by the plaintiff from 1994 to present. As a result, it appears that from 1994 to the present, the plaintiff has written checks equal to an average weekly amount of one thousand, one hundred forty-six ($1146) dollars, net of earnings taxes, for personal and family needs. Finally, the defendant testified credibly that until the parties' separation, the plaintiff routinely gave her between one hundred ($100) and one hundred fifty ($150) dollars a week in cash for spending. Based on this evidence, the court finds that the plaintiff has available to him from his earnings and recurrent funds from his father, now his father's estate, the weekly net sum of approximately one thousand twelve hundred fifty ($1250) dollars, not including distributions he has received upon the sale of assets. Any inaccuracy in this figure is based upon the plaintiff's failure to provide the court with a full and candid financial exposition.
In making its alimony order, the court has reviewed the expenses claimed by each party. From the plaintiff's affidavit, it appears that his personal financial needs are modest. He claims that he contributes the weekly sum of one hundred fifty ($150) dollars to Ms. Brunelle for household expenses. His additional itemized personal expenses total one hundred twenty-eight ($128) dollars, not including a miscellaneous expense of one hundred thirty-seven ($137) dollars. He claims also one hundred sixty-nine ($169) dollars as payment on recurrent debt. In regard to his expenditures, the court notes the plaintiff's acknowledgment that he has purchased jewelry for Ms. Brunelle, he dines out with her, they have vacationed together, and he periodically makes purchases for her children. Finally, as to the plaintiff's expenses, the court notes that he has not itemized certain auto related expenses, indicating, instead, that they are paid through his practice.
The defendant claims that her personal weekly expenses are thirteen hundred twenty-seven ($1327) dollars. Of this, CT Page 12000 nearly six hundred ($600) dollars is needed simply to pay the condo mortgage, insurance, condo association fees, and the car loan and insurance. In addition, she seeks an order requiring the plaintiff to pay the mortgage and condo fee on a vacant condo the parties jointly own in Simsbury. The court notes from both parties' affidavits that this condo, has no equity. Notwithstanding the defendant's legitimate upset that the plaintiff evicted a tenant from this condo, and deceived her in telling her that he intended to dwell in the Simsbury condo after the parties' separation, the court believes it would be foolhardy to order either party to expend funds to maintain this negative-value asset.
At present, the defendant is engaged in a career-oriented Ph.D. research project. Her ultimate success in this educational quest should inure to both parties' benefits. While her present ability to maintain employment is minimal, she will, nevertheless, have to obtain some part-time employment to supplement a reasonable alimony order. Though the court ascribes more disposable income to the plaintiff than he acknowledges, there is an insufficient amount available to meet all the defendant's reasonable needs while leaving the plaintiff with a reasonable amount for his fair needs. Accordingly, the court orders the plaintiff to pay to the defendant the sum of seven hundred fifty ($750) dollars a week as alimony pendente lite. In addition, the plaintiff shall maintain the defendant as an insured on his employment-related medical and hospital insurance until further order of the court.
The defendant has exclusive use of the Avon condo. While the court has considered the amount of the mortgage, insurance, taxes and condo fees in framing its alimony order, the court is aware that the amount awarded may be insufficient for the defendant to pay these expenses as well as her attendant living expenses. For this reason, the court expressly declines to order the defendant to pay the condo expenses and to hold the plaintiff harmless as part of this order. The defendant shall have exclusive use of the Acura automobile and shall be responsible for its expenses, including the lease obligation and insurance for the car.
The defendant shall have the option of leasing the Simsbury condo and retaining the lease payments to help meet her expenses. In the event she decides to exercise this CT Page 12001 option, she shall immediately notify the plaintiff, and she shall be required to make monthly loan repayments to the Eagle Bank for the funds she recently withdrew on the parties' line of credit from any rental payments she receives.
Bishop, J.